UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TRENITTA JOHNSON MITCHELL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-534** |
| **LEIGH ANN BEARD, ET AL.** | **SECTION "E" (3)** |

## ORDER

Before the Court is the Motion for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Doc.#50]. For the following reasons, the Court grants the motion.

**I.  Background**

The following facts are taken from both the complaint and the opposition filed by *pro se* plaintiff Trenitta Johnson Mitchell, who is a 30-40-year old married, black female with four children.[1] Mitchell applied for a "12 Month School Secretary job" at defendant St. John the Baptist Parish School Board ("the Board"). After listing the qualifications of her resume, Mitchell notes that she also listed herself as a caregiver for her mother, that she was married and had left her earlier employment when she became pregnant and when her mother became ill. Mitchell received an interview at which the Board notified her that it was also seeking to hire a Maintenance Clerk. She

---

[1] The Court has done its best to craft a background section. Defendants provided the Court with no background section in their motion, and Mitchell's opposition memorandum is 85 pages long, with e-mail strings and on-line and newspaper articles cut and pasted into it.

agreed to be interviewed for both positions. The Board did not hire her for either position but hired Jeanie Prima, aged 60-70 years and a widowed, white female with adult children, as the Maintenance Clerk.

The Board contacted Mitchell in September 2008 to ask her if she would be interested in interviewing for a receptionist position. It ultimately hired her as a receptionist to work at its central office, and she began work on October 3, 2008. Mitchell worked in the Human Resources ("HR") Department and reported directly to the HR/Personnel Director. Mitchell was the only receptionist employed at the Board.

After outlining her job duties in her opposition, Mitchell maintains that she performed numerous duties outside the scope of those listed. For example, she issued work permits, known as "clerk job duties," and performed menial tasks such as "cutting newspaper articles and gluing on construction paper, [sic] meter high volume mail." Mitchell also complains about shredding, which duty she alleges the Board assigned to her after her pregnancy. She contends that Dr. Courtney Millet, Superintendent of Schools, and defendant Dr. Leigh Ann Beard, HR Director, altered her job duties to include tasks previously assigned to other clerical professionals. Mitchell argues that the Board did not compensate her for performing extra work as it did other clerical employees.

In 2009, Mitchell applied for the position of Executive Secretary, an employee who reported directly to Millet. The Board informed Mitchell that she did not meet the typing requirement so she did not advance to the next stage of the interview process. The Parish ultimately hired a married, white female, 40-55 years old, with an adult child and who had no college education. Citing newspaper and on-line articles, Mitchell notes that several school board members called the hiring process a "sham" when they discovered that the hiree had not re-taken the typing test but had used

2

one from years before. This caused a crisis at the school board, with members calling for a vote. The outcome was not in favor of the dissenters.

Mitchell also maintains that in 2009, the Board denied her promotions to both 12-month school secretary positions at East St. John High School and Fifth Ward Elementary School.

A long dispute over time off then arose. On October 4, 2010, Mitchell asked for leave for approximately seven days to care for her husband after a surgery. One week later, she submitted a letter of resignation to Beard, citing overwhelming stress in her personal and professional life. Beard accepted the letter of resignation. On the same day, Mitchell then sent a letter to Beard in which she rescinded her letter of resignation and asked for leave from October 11 through October 31, 2010. Beard accepted the rescission because the letter of resignation had not yet gone before the Board.

On November 3, 2010, Beard notified Mitchell that she had only 2.5 days of vacation left and that she would have to fill out a Leave Without Pay Form should she wish to take off any more time. Mitchell informed Beard that her expected return date was December 6, 2010. Mitchell returned to work on December 6, 2010 and informed Beard that she was pregnant.

On February 21, 2011, Beard wrote up Mitchell for a violation of the dress code policy when she arrived at work in "white leotard type leggings." Mitchell soon began to experience symptoms of nausea, headache, back ache, tightness of chest, and shortness of breath. In March 2011, she requested – and received – forms under the Family and Medical Leave Act ("FMLA").

During her pregnancy, Dr. John McCrossen, M.D. was Mitchell's OB/GYN. McCrossen completed an Application for Extended Sick Leave and a U.S. Department of Labor Certification of Health Care Provider for Employee's Serious Health Condition. On April 19, 2011, McCrossen

3

faxed the forms to Beard. In the forms, McCrossen recommended that Mitchell not work from March 24, 2011 through August 30, 3011 based on her pregnancy. Beard responded that under the FMLA and the Extended Sick Leave Law, "[p]regnancy, in and of itself, is not an illness but a condition." Beard would therefore not bring Mitchell's request to the Board. It appears, however, that Mitchell received leave under the FMLA.

Mitchell gave birth to her fourth son on July 9, 2011. At discharge, she was given "Post Partum information." On July 19, 2011, Beard sent Mitchell a letter to inform her that she had missed 62 days (12.4 weeks), and the FMLA covered only 12 weeks. Beard told Mitchell that as of July 1, 2011, she had to apply for official leave without pay. Beard also informed her that if she did not hear from Mitchell, she would have "no choice but to recommend [her] termination based on job abandonment."

Mitchell asked for advice from Patrick Sanders, the Board's president. Sanders responded that she should request a leave of absence without pay, which would "assure [her] position for a period of one (1) year." Mitchell did so, asking for leave from July 1, 2011 through July 1, 2012. Mitchell corresponded with Beard, who sent her the appropriate documents. Mitchell completed the documents, asking only for leave through November 7, 2011. The Board approved the leave. Beard informed Mitchell that should she not return to work on November 8, 2011, the Board would consider it job abandonment. Mitchell told Beard that she would return to work on that date.

On November 7, 2011, Beard informed Mitchell that she had been transferred and was to report to the Office of Special Education in LaPlace, Louisiana. Her job title and pay rate remained the same. Mitchell reported to work, but the union filed a grievance on her (and another employee's) behalf, arguing that the Board had not followed the proper procedures to transfer her. At her new

4

job site, Mitchell again complained that her duties exceeded the scope of those outlined and even that a squirrel had invaded her work area. Beard ultimately informed the union representative, Carolyn Batiste, that Mitchell would be transferred back to the central office on January 9, 2012.

From February 8, 2012 through April 20, 2012, Mitchell wrote journal entries that detailed her complaints at work. Most of these entries address the employees' use of the shredder and/or Mitchell's being required to shred between her other job duties. As innocuous as shredding sounds, it now gives rise to "the incident."

On April 23, 2012, Millet confronted Mitchell, who had a magazine open on her desk, as to why she was not shredding. When Mitchell responded that she was performing her other job duties, Millett allegedly "walked closer to [her] personal space," glared at her, and began "scolding" her and shouting. Mitchell contends that "i[t] felt like a student who was sent to the principal's office or in a classroom being fussed at and punished by a teacher for getting into trouble." After Millet left the receptionist area, Mitchell called Beard and informed her that she needed to leave, that Beard needed to find someone to sit at the receptionist desk, and that she did not feel safe. Beard arrived at the receptionist desk as Mitchell was leaving. Millet approached both of them and asked them to enter her office to speak about the incident. Mitchell once again told Beard that she did not feel safe, and she simply left the building without leave.

Mitchell called the union but no one was able to meet her. She informed Millet of this by e-mail and asked to discuss the incident with her the following day with union representation. The next day, Beard called Mitchell into her office to discuss the incident. Mitchell informed her that she would not discuss it without union representation. A union representative, named only Iona, appeared shortly thereafter. After Mitchell recounted her version of the incident, Beard informed

her that she had three witnesses who remarked that Millet was not shouting. What followed at the meeting was a dispute as to whose version of events was correct. Beard eventually informed Mitchell that she would be on leave without pay until the Board had concluded its investigation. Mitchell requested a copy of her personnel file and what was said at the meeting. Beard informed her that she would receive a copy of her personnel file.

Beard also scheduled a meeting with Millet and Mitchell on May 7, 2012 to discuss the incident. Beard noted that Mitchell could bring along a union representative. Millet also wrote a letter to Mitchell on May 7, 2012, in which she informed Mitchell that she had refused a supervisor's request to perform a job duty, left the building without a response and misrepresented the facts to Beard when no witnesses supported them. Millet ended: "In the future, should this type of behavior occur again, you may receive additional disciplinary action up to and including termination."

Mitchell then corresponded with Beard to let her know that she would be absent from work from May 7 through May 9, 2012. It appears that Mitchell then returned to work because Beard wrote her up on May 14, 2012 for opening a piece of mail when she was not instructed to do so. Mitchell then left work for the day. Mitchell alleges that Donna Duhe, an HR clerk, yelled at her for opening the mail while she "remained silent, and like a child being punished school [sic]." Mitchell then filed a grievance with the union.

Beard scheduled a meeting on June 4, 2012 in accordance with the grievance procedure. Beard, Mitchell, Batiste and Herbert Smith[2] attended the meeting. At the meeting, the parties discussed the earlier grievance with regard to the incident with Millet. Mitchell responded

---

[2] There is no indication as to who Herbert Smith is. He had been present at the earlier meeting as well.

affirmatively,[3] *inter alia*, that Millet had asked her to shred papers, that she did not complete the task, and that she continued to walk out of the office when asked to meet with Beard and Millet. Beard ultimately informed Mitchell and Batiste that the reprimand would stand because Mitchell had responded affirmatively to these questions.

Mitchell then began to file Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race, sex, her pregnancy and retaliation. All in all, she filed three charges of discrimination. The EEOC issued at least one right-to-sue letter, which Mitchell attached to her complaint. Mitchell then sued the Board and Beard under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). As in her EEOC charge, Mitchell alleges discrimination based on race, sex, her pregnancy and retaliation.

## II.     Law and Analysis

### A.     Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in [his] favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof

---

[3] Mitchell refused to speak at the meeting, answering through Batiste.

at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

### B.  *Prima Facie* Case of Discrimination

Mitchell alleges discrimination based both on her race and her gender. The Board argues that Mitchell can not establish a *prima facie* case of racial or gender discrimination because she suffered no adverse employment action. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As amended by the Pregnancy Discrimination Act, Title VII states that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . ." 42 U.S.C. § 2000e(k).

To defeat a motion for summary judgment, a Title VII plaintiff must initially make a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class, (2) she was qualified for the position at issue, (3) she was the subject of an adverse employment action, and (4) she was treated less favorably because of her membership in that protected class than were other

8

similarly-situated employees who were not members of the protected class, under nearly identical circumstances. *Lee v. Kansas City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

The Court first addresses discrimination based on sex. The Court finds that Mitchell can not establish the fourth factor of a *prima facie* case. She has not shown – indeed, even mentioned – that she was treated less favorably than a similarly-situated male employee. There is no allegation that a male received a promotion to which she was entitled, that she was fired in favor of a male employee or that a male was hired in a position to which she was entitled. There is no mention whatsoever in her complaint or her opposition memorandum of a similarly-situated male employee. The cast of characters at the heart of this lawsuit – apart from Herbert Smith, who plays a minor, non-speaking role – is entirely female. For this reason alone, any claim of discrimination based on sex must fail.

The Court now addresses discrimination based on pregnancy. Here, Mitchell's claim also fails because she can not demonstrate that she was treated less favorably than a similarly-situated woman who was not pregnant. There is no evidence before the Court to demonstrate that any female employee who was not pregnant was treated more favorably than Mitchell. Indeed, even Mitchell's allegations reveal that the Board *bent over backwards* to accommodate her during her pregnancy, granting her leaves of absence on numerous occasions. And Mitchell's allegations reveal that the Board fully complied with the FMLA. While Beard informed Mitchell that pregnancy was not an illness and only a condition, Mitchell still received leave under the FMLA, as evidenced by Beard's letter to her dated July 19, 2011. There has been no discrimination based on pregnancy here.

As to the race claims, while the Board argues that this claim fails because Mitchell can not

prove the third factor, the Court finds that this claim fails under the fourth factor as well. There is no evidence in the record that Mitchell suffered an adverse employment action. Mitchell still works for the Board. And while she argues that on several occasions, the Board denied her a promotion, there is no evidence in the record that she was qualified for the particular position or – more importantly – that race had anything to do with the Board's denial of the promotion. Indeed, Mitchell admitted at her deposition that the Board ultimately promoted her. [Doc. #50-2 at p. 4]. There is no allegation by Mitchell that race motivated any of the Board's or the individuals' decisions. And while Mitchell alleged race discrimination in her EEOC complaint, there is no evidence in the record to support such an allegation.

Moreover, there are only two allegations in the opposition memorandum that a person not within Mitchell's protected class fared better than her. The first is when the Board originally hired Jeanie Prima, a white female. There is no evidence in the record to support this allegation, and even Mitchell admitted at her deposition that she did not know the race of the person hired. [Doc. #52-2 at pp. 21-22]. Moreover, the Board ultimately hired Mitchell – of their own volition and proactively. Mitchell admits that the Board contacted her when the receptionist position became available. There would be no reason for the Board – who had already interviewed Mitchell – to contact her to fill the receptionist position if it did not want a black woman as the receptionist.

In addition, Mitchell alleges that the Board ultimately hired a white female for an Executive Secretary position in 2009. But Mitchell offers no evidence to the Court to support this allegation. The on-line article that is cut and pasted into Mitchell's opposition and which discusses the crisis at the Board does not reveal the race of the hiree. Accordingly, this claim also fails.

10

### C. Retaliation

Mitchell also alleges a claim for retaliation. "The allocation of the burden of proof in Title VII retaliation cases depends on the nature of the plaintiff's evidence supporting the causation element." *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001). Where, as here, the plaintiff seeks to prove causation by circumstantial evidence, she carries the initial burden of establishing a *prima facie* case of retaliation. *Id.* To survive summary judgment, the plaintiff "must make a prima facie showing: (1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (internal quotation marks omitted). "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Green v. Administrators of the Tulane Educ. Fund,* 284 F.3d 642, 657 (5th Cir. 2002).

Mitchell has failed to demonstrate that she engaged in any protected activity. There is no allegation in her opposition memorandum that she ever reported discrimination of any kind to a supervisor. There is no allegation – and certainly no evidence before this Court – that she engaged in a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. While she did file three charges of discrimination with the EEOC, there is no allegation that any adverse employment action occurred as a result of the filings. Accordingly, the Court also rejects this claim.

### III. Conclusion

Accordingly, and for the foregoing reasons,

**IT IS ORDERED** that the Motion for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure [Doc.#50] is granted.

New Orleans, Louisiana, this 29th day of September, 2014.

*[signature: Daniel E. Knowles, III]*

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**